# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYAN E. RANSOM,<br><br>                Plaintiff,<br><br>    v.<br><br>M. JOHNSON, et al.,<br><br>                Defendants.<br>_____/ | CASE NO. 1:05-cv-00086-OWW-GSA PC<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION BE GRANTED IN PART AND DENIED IN PART<br><br>(Doc. 90)<br><br>OBJECTIONS DUE WITHIN THIRTY DAYS |

**Findings and Recommendations on Plaintiff's Motion for Summary Adjudication**

Plaintiff Bryan E. Ransom ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. On October 24, 2007, Plaintiff filed a motion for summary adjudication on four of the claims pending in this action.[1] (Docs. 90-93.) On

---

[1] This action is proceeding on the following claims against the following defendants: (1) a free exercise claim against Defendant Johnson; (2) an Eighth Amendment failure-to-protect claim against Defendants Canton, Flores, Adams, and Atkins; (3) a retaliation claim against Defendants Lankford, Diggs, L'Etoile, and Alameda; (4) a retaliation claim against Defendants Burruel, Case, Vance, Cary, Tennyson, and Pliler; (5) an access to the courts claim against Defendants Burruel, Case, Vance, Cary, Tennyson, and Pliler; (6) a retaliation claim against Defendants Rosario, Pliler, Kalvelage, DeGroot, Diggs, and Lankford; (7) a due process claim against Defendants Rosario, Pliler, Kalvelage, DeGroot, Diggs, and Lankford; (8) a retaliation claim against Defendant Arroyo; (9) an Eighth Amendment medical care claim against Defendant Cabral; (8) an Eighth Amendment excessive force claim against Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, and Meske; (9) a state law assault and battery claim against Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, and Meske; (10) a right to privacy claim against Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, and Meske; (11) a state law IIED claim against Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, and Meske; (12) an Eighth Amendment medical care claim against Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, Meske, Bennett, Williams, and MTA Doe; (13) a state law negligence claim against Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, Meske, Bennett, Williams, and

January 18, 2008, Defendants filed an opposition, and on June 6, 2008, Plaintiff filed a reply. (Docs. 108, 135.)

I.  **Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It is the moving party's burden to establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978).

"When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (quoting from W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Issues of Material Fact 99 F.R.D. 465, 487 (1984)). "But where the moving party has the burden - the plaintiff on a claim for relief or the defendant on an affirmative defense - his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Id. Here, Plaintiff must demonstrate there is no triable issue as to the matters alleged in his amended complaint. Id. This requires Plaintiff to establish beyond controversy every essential element of his claims. Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992); Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986). Plaintiff's evidence is judged by the same standard of proof applicable at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record they

///

---

MTA Doe; (14) a retaliation claim against Defendants Pear and Scribner; and (15) a First Amendment mail censorship claim against Defendants Pear and Scribner.

wish the Court to consider. Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact. Id.

## II. Undisputed Facts

### A. Plaintiff's Undisputed Facts

#### 1. Free Exercise Claim

1. Plaintiff is and was a practicing Muslim.
2. Defendant Johnson generated a policy via memorandum which prohibited prisoners on C-status from attending religious services.
3. On May 3, 2000, Defendant Johnson placed Plaintiff on C-status at the California Substance Abuse Treatment Facility (SATF) for refusing to comply with departmental grooming standards.

#### 2. Due Process Claim

4. The offense of "Refusal to Program" is classified as a serious rules violation.

#### 3. Excessive Force Claim

5. Defendants Bremner, Cheema, Duran, Diaz, Garcia, Hulsey, Jones, Madreno, Mayo, McDowell, Meske, Pina, and Santos witnessed and/or participated in extracting Plaintiff from his cell with the use of pepper spray for allegedly refusing a lawful order.
6. The disciplinary hearing officer dismissed the charge against Plaintiff of "Refusing a Lawful Order Resulting in the Use of O.C. Pepper Spray."

#### 4. Mail Censorship Claim

7. Defendant Pear withheld Plaintiff's outgoing mail to the media from at least October 10, 2002 thru October 1, 2003.

### B. Defendants' Additional Undisputed Facts

#### 1. Free Exercise Claim

8. At the time Plaintiff was placed on C-status, approximately 75 percent of the Facility C inmate population was serving a prison term of fifty years or more. The traditional disciplinary credit loss sanctions proved to be ineffective in curtailing the frequency and level of violence, which was perpetuated by various portions of the inmate population.

9. The restrictions placed upon inmates on C-status were designed to limit the movements of those inmates who had expressed or demonstrated an unwillingness to comply with institutional regulations.

10. Because the purpose of institutional regulations is to protect the safety and security of the institution, an inmate who refuses to comply with the regulations presents a threat to the safety and security of prison staff, other inmates, and the institution.

11. Religious services in the prison chapel at SATF are supervised by a chaplain, not by correctional officers.

12. For this reason, violence by inmates is harder to deter, and may take longer to bring under control, if it occurs at religious services.

13. When Plaintiff arrived at SATF, he was housed on the special needs yard in accordance with his endorsement by the Classification Staff Representative (CSR).

14. In his first appearance at classification committee, Plaintiff made clear his hatred of other inmates on that yard and his willingness to do violence to them.

15. Had Plaintiff been allowed to attend services in the chapel while on C-status, he necessarily would have attended them with other sensitive needs inmates.

16. During the time Plaintiff was on C-status, Defendant Johnson sent a Muslim chaplain to his cell as requested.

17. During the time Plaintiff was on C-status, he never asked Defendant Johnson for permission to attend Jumah services.

**2. Due Process Claim**

18. While at Calipatria State Prison, Plaintiff told prison officials that his life was in danger as long as he was housed on a general population yard.

19. For this reason, the institutional classification committee at Calipatria recommended that Plaintiff be transferred to the SATF sensitive needs yard (SNY).

20. That transfer was approved by a CSR on February 29, 2000.

21. Upon arrival at SATF, Plaintiff contested his SNY placement. He apparently wanted to be considered a special needs inmate, but did not want to program with "R" suffix inmates.

4

22. The "R" suffix denotes an inmate's status as a sex offender.

23. Plaintiff indicated that he would harm other "R" suffix inmates if left on the special needs yard.

24. Plaintiff also refused placement on a general population yard because of his security concerns.

25. His matter was reviewed to a CSR, who recommended transfer to California State Prison - Sacramento (CSP-Sac).

26. The Departmental Review Board ("DRB") approved that recommendation on June 8, 2001.

27. On June 22, 2001, Plaintiff was received at CSP-Sac.

28. He appeared before the classification committee on June 28, 2001.

29. The committee was aware of the reasons for the transfer, and elected to house Plaintiff in administrative segregation pending review by the Warden.

30. Plaintiff was given an opportunity to comment, and stated that he agreed with the committee's actions and understood the reasons for his placement in administrative segregation.

31. On July 5, 2001, Plaintiff was again seen by the classification committee. Plaintiff was given an opportunity to comment on his housing status, and stated he did not want to be housed either on a sensitive needs yard or a general population yard. He told the committee that the only satisfactory outcome was a release from prison.

32. On August 23, 2001, Plaintiff was again seen by the classification committee. Again he refused to go to either a sensitive needs yard or a general population yard.

33. He told the committee that he would probably do harm to other inmates on the sensitive needs yard. Most important, as the record of the hearing states, "*S* [Ransom] *believes SHU Indeterminate Placement is appropriate at this time and agrees with Committee's decision to refer S to DRB with that recommendation.*"

34. The committee voted to retain Plaintiff in administrative segregation pending completion of the transfer process.

///

35. On September 20, 2001, Plaintiff again appeared before the classification committee. Given an opportunity to comment on his housing status, he said that he agreed with the committee's action in retaining him in administrative segregation and understood the reasons for his placement there.

36. On October 18, 2001, Plaintiff again appeared before the classification committee. He again claimed he could not go to general population or special needs yards. He was given an opportunity to comment on his placement, and stated that he agreed to placement in the SHU.

37. On November 15, 2001, Plaintiff again appeared before the classification committee. Once again, he refused to be released to either a general population or special needs yard. Once again, he agreed with the committee's action in retaining him in administrative segregation.

38. On November 15, 2001, Defendant Rosario signed a memorandum for Warden Pliler and directed to Classification Services Unit Institutions Division, Chief Jeff Diggs. The memo recommended an indeterminate SHU term for Plaintiff.

39. On January 10, 2002, the DRB, composed of Defendants DeGroot, Diggs, Kalvelage, and Lankford, approved the transfer.

### 3.  **Excessive Force Claim**

40. On April 21, 2002, Plaintiff covered the window in his cell door, thus preventing officers from seeing into the cell. It is necessary for officers to be able to see into an inmate's cell in order to ensure the inmate is not engaged in any illegal activity. After multiple instructions to remove the window covering were ignored, officers conducted a cell extraction. The extraction was carried out as described in Exhibits K and L to Plaintiff's motion for summary judgment.

### 4.  **Mail Censorship Claim**

41. On October 7, 2002, Defendant Pear initiated an informal investigation into Plaintiff's plan for a mass demonstration by prisoners.

42. Prior to that date, mail room staff had made Defendant Pear aware that Plaintiff was distributing information to other inmates about a mass demonstration he was planning, apparently in an attempt to encourage their participation.

37. Defendant Pear interviewed Plaintiff, who admitted that he was planning a mass demonstration by inmates to protest the practice of double celling inmates.

38. Had this demonstration occurred, it would have caused operational and security problems at Corcoran. Staff would have had to be diverted from work, education, and food service programs to provide security and other services for inmate who were out of their cells and refused to enter their cells. Institutional inmate counts would be disrupted, as inmates are counted at their cells and work and education assignments. This would provide cover for inmates attempting to escape. Close A custody inmates, who are not allowed out of their cells past 6:00 p.m., could not be secured. Force would have to be used to secure inmates in their cells, which could lead to violence and injuries to prisoners and staff. Finally, although Plaintiff claimed the demonstration would be peaceful, prison staff had no way of knowing that any mass demonstration would remain peaceful. Staff had no way of knowing whether Plaintiff's intentions truly were peaceful, or, assuming they were, whether other inmates would behave peaceably. For these reasons, Plaintiff's planned demonstration constituted a threat to the safe operation of the prison.

## II. Plaintiff's Motion for Summary Adjudication

### A. Due Process and Free Exercise Claims Against Defendant Johnson

Plaintiff argues that he is entitled to summary adjudication on his due process and free exercise claims against Defendant Johnson. Plaintiff's due process claim against Defendant Johson was dismissed from this action with prejudice for failure to state a claim on March 27, 2007. (Doc. 19.) Therefore, Plaintiff's motion for summary adjudication as to that claim is disregarded.

Plaintiff alleges a free exercise claim arising out of his inability to attend communal prayer services. The First Amendment to the United States Constitution provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., amend. I. Prisoners "retain protections afforded by the First Amendment," including the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987). Beliefs which are both sincerely held and rooted in religious belief trigger the protection of the Free

///

Exercise Clause. Shakur v. Schriro, 514 F.3d 878, 884 (9th Cir. 2008) (quotations and citations omitted) (disavowing objective centrality test and confirming applicability of sincerity test).

However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" O'Lone, 482 U.S. at 348 (quoting Price v. Johnson, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060 (1948)). "To ensure that courts afford appropriate deference to prison officials, . . . prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone, 382 U.S. at 349. Under this standard, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987). First, "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," and "the governmental objective must itself be a legitimate and neutral one." Id. A second consideration is "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90 (internal quotations and citation omitted). A third consideration is "the impact accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally." Id. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id.

On May 3, 2000, Plaintiff was found guilty of failing to comply with grooming standards. (Undisputed Fact 3.) As a result, Plaintiff was placed on Work/Privilege Group C, which prevented him from attending religious services. (Id.) Plaintiff, a Muslim, alleges that he was unable to attend twenty-six communal prayer services, which violated a major tenant of his religion. (U.F. 1; Doc. 8, Amend. Comp., ¶34.) Plaintiff argues that his inability to attend communal prayer services impermissibly infringed upon his right to the free exercise of his religious and entitles him to summary adjudication on his claim.

Defendants argue that the regulation at issue was reasonably related to a legitimate penological interest. At the time Plaintiff was placed on C-status, approximately 75 percent of the Facility C inmate population was serving a prison term of fifty years or more, and the traditional

disciplinary credit loss sanctions proved to be ineffective in curtailing the frequency and level of violence, which was perpetuated by various portions of the inmate population. (U.F. 8.) The restrictions placed upon inmates on C-status were designed to limit the movements of those inmates who had expressed or demonstrated an unwillingness to comply with institutional regulations. (U.F. 9.) Because the purpose of institutional regulations is to protect the safety and security of the institution, an inmate who refuses to comply with the regulations presents a threat to the safety and security of prison staff, other inmates, and the institution. (U.F. 10.)

Religious services in the prison chapel at SATF are supervised by a chaplain, not by correctional officers. (U.F. 11.) For this reason, violence by inmates is harder to deter, and may take longer to bring under control, if it occurs at religious services. (U.F. 12.)

When Plaintiff arrived at SATF, he was housed on the special needs yard in accordance with his endorsement by the CSR. (U.F. 13.) In his first appearance at classification committee, Plaintiff made clear his hatred of other inmates on that yard and his willingness to do violence to them. (U.F. 14.) Had Plaintiff been allowed to attend services in the chapel while on C-status, he necessarily would have attended them with other sensitive needs inmates. (U.F. 15.) During the time Plaintiff was on C-status, Defendant Johnson sent a Muslim chaplain to his cell as requested, and Plaintiff he never asked Johnson for permission to attend Jumah services. (U.F. 16, 17.)

Plaintiff is not entitled to summary adjudication on his free exercise claim. Defendants have submitted evidence that the restriction on attending religious services was reasonably related to a legitimate penological interest. In light of Defendants' evidence, Plaintiff has failed to meet his burden of establishing beyond controversy every essential element of his claim, and the Court recommends denial of Plaintiff's motion.

**B.    Due Process Claim Against Defendants DeGroot, Kalvelage, Lankford, and Rosario**

At the time Plaintiff filed his motion, Defendant Kalvelage had not yet made an appearance in the action. Plaintiff may not seek summary adjudication against a party who had not yet made an appearance, and the motion is therefore disregarded as to Kalvelage.

///

In his amended complaint, Plaintiff alleges that Defendants Pliler and Rosario falsified a DRB referral to Defendant Diggs, stating that Plaintiff refused to program on either a general population yard or the sensitive needs yard at CSP-Sacramento and recommending that Plaintiff be transferred to the SHU to serve an indeterminate term. Plaintiff alleges that at no time had he been assigned to a general population yard or the sensitive needs yard, and that he was never issued a CDC-115 Serious Rules Violation Report charging him with refusing to program.

Plaintiff alleges that on January 10, 2002, Defendants Lankford, Diggs, Kalvelage, and DeGroot granted the request to assess Plaintiff with an indeterminate SHU term and ordered Plaintiff's transfer to the SHU at CSP-Corcoran. Plaintiff alleges that he was not provided with notice or an opportunity to be heard, that he does not meet the criteria for indeterminate SHU placement, and that the assessment of an indeterminate SHU term and transfer to Corcoran SHU were done to retaliate against him for his litigation activities and inmate appeals.

The Due Process Clause protects against the deprivation of liberty without due process of law. Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 2393 (2005). In order to invoke the protection of the Due Process Clause, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. Id. Liberty interests may arise from the Due Process Clause itself or from state law. Id. The Due Process Clause itself does not confer on inmates a liberty interest in avoiding "more adverse conditions of confinement." Id. Under state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the deprivation. Sandin v. Conner, 515 U.S. 472, 481-84, 115 S.Ct. 2293 (1995). Liberty interests created by state law are "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484; Myron v. Terhune, 476 F.3d 716, 718 (9th Cir. 2007).

If a protected liberty interest is implicated, the process due is dependent upon the reason for the segregation. If the segregation is the result of a disciplinary proceeding, the minimum procedural requirements that must be met are: (1) written notice of the charges; (2) at least 24 hours between the time the prisoner receives written notice and the time of the hearing, so that the prisoner may prepare his defense; (3) a written statement by the fact finders of the evidence they rely on and

reasons for taking disciplinary action; (4) the right of the prisoner to call witnesses in his defense, when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals; and (5) legal assistance to the prisoner where the prisoner is illiterate or the issues presented are legally complex. Wolff v. McDonnell, 418 U.S. 539, 563-71 (1974). As long as the five minimum Wolff requirements are met, due process has been satisfied. Walker v. Sumner, 14 F.3d 1415, 1420 (9th Cir. 1994). Further, "[s]ome evidence" must support the decision of the hearing officer. Superintendent v. Hill, 472 U.S. 445, 455 (1985).

However, if the segregation is non-disciplinary in nature, due process requires only that prison officials "hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated," that prison officials "inform the prisoner of the charges against [him] or the reasons for considering segregation," and that the prisoner be allowed "to present his views." Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (9th Cir. 1986). Prisoners are not entitled to "detailed written notice of charges, representation by counsel or counsel substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation." Id. Further, "due process does not require disclosure of the identity of any person providing information leading to the placement of a prisoner in administrative segregation." Id.

Plaintiff's position is that Defendants assessed him an indeterminate SHU term for the disciplinary offense of "Refusal to Program" without affording him written notice via a rules violation report (form CDC-115) or a disciplinary hearing. Plaintiff maintains that he is entitled to the procedural protections set forth in Wolff because of the nature of his segregation but did not receive them.

Defendants' position is that Plaintiff was not segregated for a disciplinary offense and is entitled to only the minimal protections set forth in Toussaint, which he received.

In his reply, Plaintiff asserts that his placement was not non-adverse and he is entitled to the protections in Wolff because he lost thirty-eight days of time credits. (Doc. 135, pg. 4:1-27.)

The focus of this motion is limited to whether Plaintiff has established beyond controversy every essential element of his claims. In light of the evidence before the Court, Plaintiff has not done so. Defendants have submitted evidence that Plaintiff was segregated not for disciplinary reasons

but because he refused placement on a general population yard due to his safety concerns and refused placement on a sensitive needs yards because he did not want to be housed with "R" suffix inmates, which denotes sex offenders. (U.F. 18-39.) Defendants have submitted evidence that because of Plaintiff's refusal to be placed on a general population yard or sensitive needs yard, there was no alternative other than indeterminate placement in segregated housing and that Plaintiff was not approved for the indeterminate SHU term because of a rule violation against him. (Id.) Further, Defendants have submitted evidence that Plaintiff was given notice and an opportunity to be heard on more than one occasion during the proceedings held to determine how and where to place Plaintiff. (Id.) In light of the evidence, Plaintiff has not established beyond controversy that he was segregated for a disciplinary offense without the heightened protections he was due under Wolff.

Plaintiff's attempt to demonstrate his entitlement to the Wolff factors by raising the loss of time credits is one that, if proved by Plaintiff, would lead to the loss of Plaintiff's due process claim altogether. Plaintiff is absolutely barred from pursuit in this action of *any* due process claim arising out of a proceeding where he lost time credits, unless the credits have been restored through another proceeding. Wilkinson v. Dotson, 544 U.S. 74, 81-2, 125 S.Ct. 1242, 1248 (2005). At this juncture, the claim at issue has been defined as one arising from the alleged assessment of an indeterminate SHU term without due process. (Docs. 17, 19.) The evidence cited to by Plaintiff in support of his argument is not such that the Court may reach a conclusion that Plaintiff actually lost thirty-eight days of time credits in addition to being assessed a SHU term. (Doc. 136, Ex. A.) However, if such evidence comes before the Court, it will re-evaluate the viability of Plaintiff's pending due process claim at that time.

      C.     **Excessive Force Claim Against Defendants Bremner, Cheema, Diaz, Duran, Garcia, Hulsey, Jones, Madreno, Mayo, McDowell, Pina, and Santos**

Defendants Jones and Bremner had not made an appearance in this action at the time Plaintiff filed his motion, and Defendants Garcia and Madreno have not been personally served or waived service. Therefore, Plaintiff's motion for summary adjudication is disregarded as to Defendants Jones, Bremner, Garcia, and Madreno.

///

In his amended complaint, Plaintiff alleges that Defendants Bremner, Diaz, Jones, Cheema, Duran, Hulsey, Mayo, Garcia, Pina, Madreno, Santos, McDowell, and Meske used excessive force against him on April 20, 2002, and April 21, 2002, during which time Plaintiff was pepper sprayed and hooded with a spit mask which covered his entire head.[2]

"What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." Hudson v. McMillian, 503 U.S. 1, 8 (1992). "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." Id. (internal quotation marks and citations omitted). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. Id. at 9; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries)). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. (internal quotation marks and citations omitted). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." Id.

---

[2] The incident started the night of April 20 and continued into the early morning hours of April 21.

13

Plaintiff contends that Defendants Bremner, Cheema, Duran, Diaz, Garcia, Hulsey, Jones, Madreno, Mayo, McDowell, Meske, Pina, and Santos witnessed and/or participated in extracting Plaintiff from his cell with the use of pepper spray for allegedly refusing a lawful order. (U.F. 5.) Plaintiff contends that the disciplinary charge of "Refusing a Lawful Order Resulting in the Use of O.C. Pepper Spray" was dismissed against him, U.F. 6, because of a preponderance of the evidence in his favor.

Defendants submit that on April 21, 2002, Plaintiff covered the window in his cell door, thus preventing officers from seeing into the cell. (U.F. 40.) It is necessary for officers to be able to see into an inmate's cell in order to ensure the inmate is not engaged in any illegal activity, and after multiple instructions to remove the window covering were ignored, officers conducted a cell extraction, which was carried out as described in Exhibits K and L to Plaintiff's motion for summary judgment. (Id.) Defendants dispute that the disciplinary charge was dismissed because of the preponderance of the evidence in Plaintiff's favor.

Plaintiff's evidence does not support his contention regarding the reason for the dismissal of the disciplinary charge. Rather, the charge was dismissed in the interest of justice because of the errors in the CDC-115 rules violation report. Defendants have submitted evidence that Plaintiff was extracted from his cell with the use of pepper spray because he covered the window to his cell, which prevents staff from ensuring illegal activities are not occurring, and ignored repeated orders to uncover the window. Accordingly, Plaintiff has not established beyond controversy that the force used against him was malicious and sadistic and employed for the purpose of causing harm rather than employed in a good-faith effort to maintain or restore discipline. Plaintiff's motion for summary adjudication on his excessive force claim must be denied.

### D.   First Amendment Claim Against Defendant Pear

Finally, Plaintiff moves for summary adjudication on his First Amendment claim against Defendant Pear. In his amended complaint, Plaintiff alleges that on October 10, 2002, Defendant Pear interviewed him on the ground that Defendant had received information that Plaintiff was planning to stage a demonstration against CDCR. Plaintiff confirmed the information and stated that on February 26, 2003, the "Three-Strike Backlash Campaign" would be launched, and prisoners

would be called upon to lawfully resist CDCR's forced double celling practice. Defendant Pear told him that Defendant Scribner, who was the warden, did not take kindly to prison activism and had ordered Defendant Pear to shut down Plaintiff's efforts. Plaintiff's incoming and outgoing mail was thereafter flagged and forwarded to Defendant Pear for censorship. Numerous press releases and letters to the media and other outside organizations were forwarded to Defendant Pear, who issued Plaintiff a CDC-115 Rules Violation Report for inciting on February 25, 2003. Plaintiff alleges that his hearing on the charge, which should have been held within thirty days, was delayed until July 30, 2003, by Defendant Scribner. At the hearing, Plaintiff discovered that Defendant Pear had withheld all of his press releases and letters. After reviewing the material, the hearing officer dismissed the charge, finding that Plaintiff's campaign fell within CDCR guidelines and the First Amendment. Plaintiff asserts a First Amendment claim arising out of the confiscation of his outgoing mail.

Plaintiff has a First Amendment right to send outgoing mail. Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995). However, the right is not absolute and may be infringed upon by prison officials under certain circumstances. Id. Prisoners do not retain rights inconsistent with proper incarceration, Overton v. Bazzetta, 539 U.S. 126, 131, 123 S.Ct. 2162 (2003), and courts are to analyze regulations impinging upon rights which are inconsistent with proper incarceration under the Turner test, Johnson v. California, 543 U.S. 499, 500, 125 S.Ct. 1141 (2005), previously set forth in subsection A. "When a prison regulation affects outgoing mail as opposed to incoming mail, there must be a closer fit between the regulation and the purpose it serves," although "in neither case must the regulation satisfy a least restrictive means test." O'Keefe v. Van Boening, 82 F.3d 322, 326 (9th Cir. 1996) (quotations and citations omitted).

In his motion, Plaintiff argues that he is entitled to summary adjudication on the claim that Defendant Pear withheld his outgoing mail to the media from at least October 10, 2002, through October 1, 2003. (U.F. 7.) In support of his motion, Plaintiff submits evidence that on February 25, 2003, Defendant Pear confiscated letters addressed to KMPH TV, Pacifica Radio, and Dr. Ray Evans. The letters were confiscated because they contained documents indicating Plaintiff's intent to initiate a mass inmate demonstration to commence on February 26, 2003, and the letters requested publicity of the event. (Doc. 91, 37:23-38:2; Doc. 91, Ex. V.) Plaintiff submits evidence that the

15

correspondence was withheld until October 1, 2003, at which time the three letters were returned to Plaintiff. (Doc. 91, 38:2-7; Doc. 93, Ex. X.)

Defendants have submitted evidence that the planned demonstration was considered a threat to the safe operation of the prison, and that even though Plaintiff contended it was to be a peaceful demonstration, they had no way of confirming Plaintiff's intent or of predicting that the demonstration would remain peaceful. (U.F. 38.) Defendants argue that Plaintiff's claim of interference with his planned and lawful demonstration must fail because Defendant Pear determined the demonstration was not lawful, and Plaintiff did not have a right to disrupt administration of the prison. Defendants also argue that Plaintiff had an alternate means of expressing his unhappiness with the double celling issue by filing an administrative grievance or filing suit.

The problem with Defendants' argument is that the claim arises not out of the right of association but out of the right to send mail. Plaintiff is not premising his claim on an unconstitutional disallowance of an inmate demonstration or from an unconstitutional interference with his right to redress his grievance over double celling. In order to defeat Plaintiff's motion, Defendants must submit evidence raising a disputed issue of fact. Under Turner, this requires that Defendants proffer evidence that the confiscation of Plaintiff's outgoing letters to the media was reasonably related to a legitimate penological interest. If there is no rational relationship to a legitimate and neutral governmental objection, the remaining three Turner factors are not reached. Prison Legal News v. Lehman, 397 F.3d 692, 699 (9th Cir. 2005).

"Court must afford substantial deference to the professional judgment of prison administrators." Overton, 539 U.S. at 132. Here, however, Defendants have submitted no evidence that the three letters to the media represented a threat to the safety and security of the institution. Outgoing mail, by its very nature, does not represent the same level of serious threat to institutional safety and security that incoming mail does, and security implication arising from outgoing mail are far more predictable. Thornburgh v. Abbott, 490 U.S. 401, 411-12, 109 S.Ct. 1874 (1989) (citing to Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800 (1974)). The record is simply devoid of any evidence that Plaintiff's letters to the media describing his planned demonstration and asking

///

them to publicize it represented a threat to the safety and security of the institution and justified the confiscation of the letters.

Further, although Defendant Pear argues that in the alternative, he is entitled to qualified immunity, Defendant's only argument is that Plaintiff presented no evidence his right "to organize and publicize a mass demonstration overly designed to disrupt prison operations" was clearly established. (Doc. 108-9, Opp., pg. 12:6-9.) This argument does not address Plaintiff's First Amendment claim that his outgoing mail was confiscated. At the time of the mail confiscation, it was clear that prisoners had a First Amendment right to send mail and that the right could be infringed upon only if the infringement was rationally related to a legitimate penological purpose. O'Keefe, 82 F.3d at 325-26; Witherow, 52 F.3d at 325. Preserving the safety and security of a prison is certainly a legitimate penological purpose, but there has been no showing that the mailing of the three letters to the media would have presented a threat to the safety and security of the institution, and as such, Defendant has not demonstrated entitlement to qualified immunity. In the absence of any evidence linking the confiscation of the outgoing letters by Defendant Pear to a legitimate penological purpose, Court must recommend that Plaintiff be granted judgment as a matter of law on his First Amendment claim.[3]

### IV.    Conclusion and Recommendation

For the reasons set forth herein, the Court finds that Plaintiff has not met his burden of establishing beyond controversy every essential element of his free exercise, due process, and excessive force claims. Therefore, Plaintiff is not entitled to summary adjudication as to those claims. However, Defendants have not submitted evidence raising a disputed issue of fact on Plaintiff's First Amendment mail censorship claim, and as a result, Plaintiff is entitled to judgment on that claim. Accordingly, the Court HEREBY RECOMMENDS that Plaintiff's motion, filed October 24, 2007, be DENIED as to the free exercise, due process, and excessive force claims, and GRANTED as to the mail censorship claim.

///

---

[3] This entitlement to judgment is limited to the confiscation of the three letters.

1  These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**    **June 18, 2008**           /s/ **Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE