1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT FOR THE

7                   EASTERN DISTRICT OF CALIFORNIA

8

9  BRYAN RANSOM,                  )     No. CV-F-05-086 OWW/GSA PC
                                  )
10                                )     ORDER STRIKING DOC. 168,
                                  )     GRANTING DEFENDANTS' MOTION
11              Plaintiff,        )     FOR RELIEF FROM ORDER
                                  )     ADOPTING FINDINGS AND
12         vs.                    )     RECOMMENDATIONS (Doc. 161)
                                  )     AND ADOPTING FINDINGS AND
13                                )     RECOMMENDATION (Doc. 141)
   M. JOHNSON, et al.,            )     AND GRANTING IN PART AND
14                                )     DENYING IN PART PLAINTIFF'S
                                  )     MOTION FOR SUMMARY JUDGMENT
15              Defendants.       )     (Doc. 90)
                                  )
16  _____)

17

18

19       By Memorandum Decision and Order filed on August 26, 2008,

20  (Doc. 161), the Court adopted the Findings and Recommendation of

21  the United States Magistrate Judge that Plaintiff's motion for

22  summary judgment be granted in part and denied in part.  In so

23  doing, the Court reviewed Plaintiff's objections to the Findings

24  and Recommendation and did not address Defendants' objections to

25

26

                              1

the Findings and Recommendation filed on August 25, 2008.[1]

On September 17, 2008, Defendants filed a motion for relief from the August 26, 2008 Memorandum Decision and Order, requesting that the Court consider Defendants' objections to the Findings and Recommendations.

Defendants' motion for relief from the August 26, 2008 Memorandum Decision and Order is GRANTED to the extent that it seeks consideration of Defendants' objections.

In accordance with the provisions of 28 U.S.C. ' 636 (b)(1)(B) and Local Rule 73-305, this court has conducted a de novo review of this case.  Having carefully reviewed the entire file, the court finds the findings and recommendation to be supported by the record and proper analysis.

In pertinent part, the Findings and Recommendation recommended that the Court grant Plaintiff's motion for summary judgment on his First Amendment claim against Defendant Pear:

> In his amended complaint, Plaintiff alleges that on October 10, 2002, Defendant Pear interviewed him on the ground that Defendant had received information that Plaintiff was planning to stage a demonstration against CDCR.  Plaintiff confirmed the information and stated that on February 26, 2003, the 'Three-Strike Backlash Campaign' would be launched, and prisoners would be called upon to lawfully resist CDCR's forced double celling practice.  Defendant Pear told him that Defendant Scribner, who was the warden, did not take kindly to prison activism and had ordered Defendant Pear to shut down Plaintiff's efforts.  Plaintiff's incoming

---

[1]The Memorandum Decision and Order filed on October 14, 2008, (Doc. 168), was filed in error.  Doc. 168 is hereby STRICKEN.

2

and outgoing mail was thereafter flagged and forwarded to Defendant Pear for censorship. Numerous press releases and letters to the media and other outside organizations were forwarded to Defendant Pear, who issued Plaintiff a CDC-115 Rules Violation Report for inciting on February 25, 2003.  Plaintiff alleges that his hearing on the charge, which should have been held within thirty days, was delayed until July 30, 2003, by Defendant Scribner.  At the hearing, Plaintiff discovered that Defendant Pear had withheld all of his press releases and letters.  After reviewing the material, the hearing officer dismissed the charge, finding that Plaintiff's campaign fell with CDCR guidelines and the First Amendment. Plaintiff asserts a First Amendment claim arising out of the confiscation of his outgoing mail.

Plaintiff has a First Amendment right to send outgoing mail.  <u>Witherow v. Paff</u>, 52 F.3d 264, 265 (9th Cir.1995).  However, the right is not absolute and may be infringed upon by prison officials under certain circumstances. <u>Id</u>.  Prisoners do not retain rights inconsistent with proper incarceration. <u>Overton v. Bazetta</u>, 539 U.S. 126, 131 ... (2003), and courts are to analyze regulations impinging upon rights which are inconsistent with proper incarceration under the <u>Turner</u> test, <u>Johnson v. California</u>, 543 U.S. 499, 500 ... (2005), previously set forth in subsection A.  'When a prison regulation affects outgoing mail as opposed to incoming mail, there must be a closer fit between the regulation and the purpose it serves,' although 'in neither case must the regulation satisfy a least restrictive means test.' <u>O'Keefe v. Van Boening</u>, 82 F.3d 322, 326 (9th Cir.1996) ....

In his motion, Plaintiff argues that he is entitled to summary adjudication on the claim that Defendant Pear withheld his outgoing mail to the media from at least October 10, 2002, through October 1, 2003.  (U.F. 7).  In support of his motion, Plaintiff submits evidence that on February 25, 2003, Defendant Pear confiscated letters addressed to KMPH

3

TV, Pacifica Radio, and Dr. Ray Evans.  The letters were confiscated because they contained documents indicating Plaintiff's intent to initiate a mass inmate demonstration to commence on February 26, 2003, and the letters requested publicity for the event.  (Doc. 91, 37:23-38:1; Doc. 91, Ex. V.)  Plaintiff submits evidence that the correspondence was withheld until October 1, 2003, at which time the three letters were returned to Plaintiff.  (Doc. 91, 38:2-7; Doc. 93, Ex. X.)

Defendants have submitted evidence that the planned demonstration was considered a threat to the safe operation of the prison, and that even though Plaintiff contended it was to be a peaceful demonstration, they had no way of confirming Plaintiff's intent or of predicting that the demonstration would remain peaceful.  (U.F. 38.)  Defendants argue that Plaintiff's claim of interference with his planned and unlawful demonstration must fail because Defendant Pear determined the demonstration was not lawful, and Plaintiff did not have a right to disrupt administration of the prison.  Defendants also argue that Plaintiff had an alternate means of expressing his unhappiness with the double celling issue by filing an administrative grievance or filing suit.

The problem with Defendants' argument is that the claim arises not out of the right of association but out of the right to send mail.  Plaintiff is not premising his claim on an unconstitutional disallowance of an inmate demonstration or from an unconstitutional interference with his right to redress his grievance over double celling.  In order to defeat Plaintiff's motion, Defendants must submit evidence raising a disputed issue of fact.  Under Turner, this requires that Defendants proffer evidence that the confiscation of Plaintiff's outgoing letters to the media was reasonably related to a legitimate penological interest.  If there is no rational relationship to a legitimate and neutral governmental objection, the remaining three Turner factors are not reached.  Prison Legal News v.

4

<u>Lehman</u>, 397 F.3d 692, 699 (9th Cir.2005).

'Courts must afford substantial deference to the professional judgment of prison administrators.' <u>Overton</u>, 539 U.S. at 132. Here, however, Defendants have submitted no evidence that the three letters to the media represented a threat to the safety and security of the institution.  Outgoing mail, by its very nature, does not represent the same level of serious threat to institutional safety and security that incoming mail does, and security implications from outgoing mail are far more predictable. <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 411-12 ... (1989)(citing to <u>Procunier v. Martinez</u>, 416 U.S. 396, 413 ... (1974).  The record is simply devoid of any evidence that Plaintiff's letters to the media describing his planned demonstration and asking them to publicize it represented a threat to the safety and security of the institution and justified the confiscation of the letters.

Further, although Defendant Pear argues that in the alternative, he is entitled to qualified immunity, Defendant's only argument is that Plaintiff presented no evidence his right 'to organize and publicize a mass demonstration overly [sic] designed to disrupt prison operations' was clearly established.  (Doc. 108-9, Opp., pg. 12:6-9.) This argument does not address Plaintiff's First Amendment claim that his outgoing mail was confiscated.  At the time of the mail confiscation, it was clear that prisoners had a First Amendment right to send mail and that the right could be infringed upon only if the infringement was rationally related to a legitimate penological purpose. <u>O'Keefe</u>, 82 F.3d at 325-26; <u>Witherow</u>, 52 F.3 at 325. Preserving the safety and security of a prison is certainly a legitimate penological purpose, but there has been no showing that the mailing of the three letters to the media would have presented a threat to the safety and security of the institution, and as such, Defendant has not demonstrated entitlement to qualified immunity.  In the absence of any evidence linking the confiscation of the outgoing letters by Defendant Pear to a

5

1              legitimate penological interest, Court must
     recommend that Plaintiff be granted judgment
2    as a matter of law on his First Amendment
     claim.[3]

3

4    [3]This entitlement to judgment is limited to
     the confiscation of the three letters.

5        Defendants object to the Findings and Recommendation,

6    asserting that Plaintiff contends that Defendant Pear had no

7    right to block his efforts to publicize his planned demonstration

8    by confiscating the three letters.  Defendants argue that

9    Plaintiff's contention fails because the purpose of the three

10   letters to the media was to promote an unlawful demonstration.

11   Defendants contend that Defendant Pear's actions were reasonably

12   related to a legitimate penological interest because Plaintiff's

13   activity violated numerous prison regulations.  Specifically,

14   Defendants refer to 15 C.C.R. § 3006(c)(5) and (6):

15             Except as authorized by the institution head,
     inmates shall not possess or have under their
16   control any matter which contains or concerns
     any of the following:

17
     ...
18
     (5) Plans to disrupt the order, or breach the
19   security, of any facility.

20   (6) Plans for activities which violate the
     law, these regulations, or local procedures.
21
     Defendants also refer to 15 C.C.R. § 3132(a): "Correspondents are
22
     personally responsible for the content of each item of mail they
23
     send into or out of a correctional facility."  Finally,
24
     Defendants cite 15 C.C.R. § 3136(a):
25
               Disapproval of inmate mail that is in clear
26   violation of CCR section[] 3006 ... shall be

> referred to staff not below the level of
> Correctional Facility Captain for
> determination and appropriate action.
> Disapproval of inmate mail that is not in
> clear violation of CCR section[] 3006 ...
> shall be referred to the Warden, but not
> lower than the Chief Deputy Warden, for
> determination and appropriate action.  When
> incoming and outgoing mail ... are addressed
> to or being sent by an inmate are withheld or
> disallowed, the inmate shall be informed via
> CDC Form 1819, Notification of Disapproval –
> Mail ... of the reason, disposition, name of
> official disallowing the mail ..., and the
> name of the official to whom an appeal can be
> directed.

Defendants place primary reliance on *Jones v. N.C. Prisoners' Labor Union, Inc.* 433 U.S. 119 (1977).

In *Jones*, a prisoners' labor union brought an action under Section 1983, claiming that its First Amendment rights were violated by prison regulations that prohibited prisoners from soliciting other inmates to join the union and barred union meetings and bulk mailings concerning the union from outside sources.  The Supreme Court held:

> An examination of the potential restrictions
> on speech or association that have been
> imposed by the regulations under challenge,
> demonstrates that the restrictions imposed
> are reasonable, and are consistent with the
> inmates' status as prisoners and with the
> legitimate operational considerations of the
> institution.  To begin with, First Amendment
> speech rights are barely implicated in this
> case. Mail rights are not themselves
> implicated; the only question respecting the
> mail is that of bulk mailings.  The
> advantages of bulk mailings to inmates by the
> Union are those of cheaper rates and
> convenience ... [I]t is clear that losing
> these cost advantages does not fundamentally
> implicate *free speech* values.  Since other
> avenues of outside informational flow by the

Union remain available, the prohibition on
bulk mailing, reasonable in the absence of
First Amendment considerations, remains
reasonable ....

Nor does the prohibition on inmate-to-inmate
solicitation of membership trench untowardly
on the inmates' First Amendment speech
rights.  Solicitation of membership itself
involves a good deal more than the simple
expression of individual views as to the
advantages or disadvantages of a union or its
views; it is an invitation to collectively
engage in a legitimately prohibited activity.
If the prison officials are otherwise
entitled to control organized union activity
within the prison walls, the prohibition on
solicitation for such activity is not then
made impermissible on account of First
Amendment considerations, for such a
prohibition is then not only reasonable but
necessary.

First Amendment associational rights, while
perhaps more directly implicated by the
regulatory prohibitions, likewise must give
way to the reasonable considerations of penal
management.  As already noted, numerous
associational rights are necessarily
curtailed by the realities of confinement.
They may be curtailed whenever the
institution's officials, in the exercise of
their informed discretion, reasonably
conclude that such associations, whether
through group meetings or otherwise, possess
the likelihood of disruption to prison order
or stability, or otherwise interfere with the
legitimate penological objectives of the
prison environment.  As we noted in *Pell v.
Procunier* ..., 'central to all other
correctional goals is the institutional
consideration of internal security within the
corrections facilities themselves.'

Appellant prison officials concluded that the
presence, perhaps even the objectives, of a
prisoners' labor union would be detrimental
to order and security in the prisons ....  It
is enough to say that they have not been
conclusively shown to be wrong in this view.
The interest in preserving order and

8

1    authority in the prisons is self-evident.
     Prison life, and relations between the
2    inmates themselves and between the inmates
     and prison officials or staff, contain the
3    ever-present potential for violent
     confrontation and conflagration ...
4    Responsible prison officials must be
     permitted to take reasonable steps to
5    forestall such a threat, and they must be
     permitted to act before the time when they
6    can compile a dossier on the eve of a riot.
     The case of a prisoners' union, where the
7    focus is on the presentation of grievances
     to, and encouragement of adversary relations
8    with, institution officials surely would rank
     high on anyone's list of potential trouble
9    spots.  If the appellants' views as to the
     possible detrimental effects of the
10   organizational activities of the Union are
     reasonable, as we conclude they are, then the
11   regulations are drafted no more broadly than
     they need be to meet the perceived threat -
12   which stems directly from group meetings and
     group organizational activities of the Union
13   ... When weighed against the First Amendment
     rights asserted, these institutional reasons
14   are sufficiently weighty to prevail.

15   433 U.S. at 130-133.  In ruling that First Amendment speech

16   rights were "barely implicated" by the prohibition on bulk

17   mailing, the Supreme Court noted:

18          The State has not hampered the ability of
            prison inmates to communicate their
19          grievances to correctional officials.  In
            banning Union solicitation or organization,
20          appellants have merely affected one of
            several ways in which inmates may voice their
21          complaints to, and seek relief, from prison
            officials.  There exists an inmate grievance
22          procedure through which correctional
            officials are informed about complaints
23          concerning prison conditions, and through
            which remedial action may be secured ...
24          With this presumably effective path available
            for the transmission of grievances, the fact
25          that the Union's grievance procedure might be
            more 'desirable' does not convert the
26          prohibitory regulations into unconstitutional

                                  9

1    acts.

2  *Id.* at 130 n.6.

3    *Jones* is not valid authority that the confiscation of

4  Plaintiff's letters to media outlets seeking publicity for his

5  planned demonstration at the prison does not violate the First

6  Amendment.  *Jones* is authority that the prison would not have

7  violated Plaintiff's First Amendment right to conduct the

8  demonstration at the prison or to solicit participation in the

9  demonstration.

10    Defendants' argue that the Plaintiff's First Amendment right

11  to send mail was not violated by the confiscation of the three

12  letters because the purpose of the letters was to promote an

13  unlawful association.

14    Defendants refer to the press release authored by Plaintiff

15  to be sent to KMPH TV, Channel 26, in Fresno:

16          This press release is being generated from
            the Security Housing Unit (SHU) of Corcoran
17          State Prison by this Founding
            President/Minister of Defense of the
18          'National Plantation Psychosis Awareness
            Committee.'  (N.P.P.A.C. - Pronounced N-PAC)
19
            As a collateral attack on the California 3-
20          Strike Law, N.P.A.C. is initiating a state
            wide demonstration through out the California
21          Department of Corrections (CDC), which it has
            coined 'The 3-Strike Back Lash.'
22
            This state wide 3-Strike Back Lash
23          demonstration starts February 26, 2003, and
            calls for all CDC inmates to resist CDC's
24          illegal practice of the forced double celling
            of unwilling inmates into cells designed for
25          one man occupancy.  Thus creating a lethal
            and barbaric gladiator environment for
26          inmates throughout the State of California.

                              10

1
2
3

> This illegal practice of forced double celling has in effect placed all CDC cells at over 190% capacity and is the only single element which makes the draconian 3-Strike Law economically and physically possible.

4
5
6
7
8

> N.P.P.A.C. is a grass-root Black Nationalist Prison/Community based organization that is dedicated to the eradication of social and judicial injustice; traditional racism, cultural amnesia; functional illiteracy; miseducation; welfare, drug and alcohol dependency; fatherless households; black on black crime, etc. ... through proper education and effective demonstrations.

9
10
11
12

> For more information on the N.P.P.A.C. agenda and/or 3-Strike Backlash demonstration starting February 26, 2003, see http://www.etext.org/Politics/MIM/agitation/ prisons/campaigns/ca/3strike.txt or email: <mim@mim.org>

13
14
15

A virtually identical Press Release was authored by Plaintiff and addressed to Pacifica Radio - KPFA, in Berkeley, California.  The Press Release addressed to Pacifica Radio also stated:

16
17
18
19
20

> N.P.P.A.C. is sponsored by:
>
> Dr. Donald Ray Evans, Sr. - CEO
> National Association of Bros. & Sis Inside and Out (NABSIO)
> 1713 West 108th Street
> Los Angeles, Calif. 90047
> Phone: (323) 755-6024
> Fax: (323) 754-1506

21

(Doc. 93, Exhs. S and T).

22
23
24
25
26

Because Plaintiff's press releases state that the planned demonstration was to be state-wide, Defendants argue that easiest, most effective way for Plaintiff to communicate with fellow prisoners and encourage their participation in the demonstration was indirectly, through the media.  Defendants

11

argue that Defendant Pear could have reasonably concluded that Plaintiff had decided to use the media to communicate with prisoners in other institutions, thereby furthering Plaintiff's goal of disrupting normal prison operations.  Defendants refer to Defendant Pear's declaration in contending that Defendant Pear's primary concern was not in censoring Plaintiff's mail, but in preventing the unlawful demonstration that the mailings sought to further:

> 5.  Had this demonstration occurred, it would have caused operational and security problems at Corcoran.  Staff would have had to be diverted from work, education and food service programs to provide security and other [undecipherable] inmates who were out of their cells and refused to enter their cells. [Undecipherable] would be disrupted, as inmates are counted in their cells and work [undecipherable].  This would provide cover for inmates attempting to escape. Given [undecipherable] inmates who are not allowed out of their cells past 6:00 p.m., could not be secured. [Undecipherable] be used to secure inmates in their cells, which could lead to violence and injuries to prisoners and staff.  Finally, although Ransom claims the demonstration would remain peaceful, Staff had no way of knowing whether Ransom's intentions truly were peaceful or, assuming they were, whether other inmates would behave peaceably.  For these reasons, Ransom's planned demonstration constituted a threat to the safe operations of the prison.

There is nothing in Defendant Pear's declaration that he was concerned that the Press Releases would have encouraged participation in the planned demonstration by prisoners housed at institutions other than Corcoran.

Citing *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), that

"[p]erhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison," Defendants argue that prison officials may also refuse to send or deliver mail concerning proposed unlawful activity that may be punished by means other than criminal sanctions, if such mail threatens institutional security by encouraging deliberate breaches of prison regulations:

> [I]t is of no importance that Pear's declaration focuses on the threat to institutional security of the planned demonstration, rather than the specific pieces of mail.  The former were intended to support the latter, or at least might have had that effect.  The mailings constituted a threat to institutional security.  As in *Procunier*, the connection between the mailings and the planned demonstration is inherent.  As a practical matter, therefore, the line that the Magistrate Judge attempted to draw between the demonstration and the mailings does not exist.

Defendants, emphasizing the deference federal courts pay to the informed discretion of prison officials, argues that they need not show that Plaintiff's proposed Press Releases in fact encouraged other inmates to participate in the planned demonstration.  Defendants argue that the fact that Plaintiff's efforts to publicize the planned demonstration could have served the purpose of encouraging other inmates to join him, thus establishing a sufficient nexus between Defendant Pear's actions and the legitimate penological interest in maintaining

institutional safety and security.

Defendants' position is unsupported by any evidence that Defendant Pear was concerned that the Press Releases would have encouraged inmates from other institutions to join in the planned demonstration.  Defendant Pear's declaration contains no such averment; Defendant Pear was concerned about the security at Corcoran if the planned demonstration occurred.

Defendants object to the Finding and Recommendation that Defendant Pear is not entitled to qualified immunity from liability.[2]

Defendants contend that the proper inquiry is whether a reasonable officer in Defendant Pear's position could have construed Plaintiff's press releases as encouraging other inmates to join his unlawful demonstration and, thus, that he was protecting the safety and security of the institution by preventing dissemination of the press releases.  Defendants contend:

> A reasonable officer could have read the releases as encouraging support for Ransom's demonstration not only among the general public, but among inmates.  A reasonable officer could have construed them as Ransom's most effective way to communicate with inmates statewide.  *Procunier* recognized as much in declaring it obviously justifiable for prison officials to confiscate outgoing inmate mail concerning proposed criminal

---

[2]Defendants further argue that Defendant Pear is entitled to immunity from suit for non-discretionary acts performed in good faith pursuant to state regulations.  Because Defendants did not raise this argument in their opposition to the motion for summary judgment, it is not discussed here.

14

activity *inside* the prison ... Thus, Pear
could reasonably have thought that by
confiscating Ransom's press releases, he was
furthering the legitimate penological goal of
preventing the demonstration.

Defendant Pear is not entitled to qualified immunity as argued by Defendants.  There is no evidence in the record that Defendant Pear confiscated the press releases because he feared that the press releases would encourage inmates in other correctional facilities or even Corcoran to participate in the demonstration.

For the reasons stated:

1.   Doc. 168 is STRICKEN;

2.   Defendants' motion for relief from the August 26, 2008 Memorandum Decision and Order is GRANTED to the extent that it seeks consideration of Defendants' objections;

3.   Based on the Court's *de novo* review of the record, including Defendants' objections, the Court concurs with the Findings and Recommendation and adopts them;

4.   Plaintiff's motion for summary judgment, (Doc. 90), is GRANTED IN PART AND DENIED IN PART;

5.   The action is remanded to the United States Magistrate Judge for further proceedings.

IT IS SO ORDERED.

Dated:    October 21, 2008          _____/s/ Oliver W. Wanger_____
                                    UNITED STATES DISTRICT JUDGE